**M. Curt MELTZER, Plaintiff-Appellant,**

v.

**CRESCENT LEASEHOLDS, LTD., et al.,**
**Defendants-Appellees,**

**and**

**Albert Gareh, Defendant.**

**No. 624, Docket 35399.**

United States Court of Appeals,
Second Circuit.

Argued April 16, 1971.

Decided April 29, 1971.

Daniel H. Greenberg, New York City, for plaintiff-appellant.

Peter K. Leisure, New York City, (John E. Sprizzo, Curtis, Mallet-Prevost, Colt & Mosle, New York City, of counsel), for defendants-appellees Crescent Leaseholds, Ltd., John G. Bennett and A. Gordon Bennett.

Russell E. Brooks, New York City, (Milbank, Tweed, Hadly & McCloy, New York City, of counsel), for defendants-appellees The Royal Trust Co. and Wachovia Bank and Trust Co.

Before WATERMAN, SMITH and KAUFMAN, Circuit Judges.

PER CURIAM:

M. Curt Meltzer, a resident of New York, brought suit against Crescent Leaseholds, Ltd. ("Crescent"), a Canadian real estate development concern, and its principal shareholders, John G. and A. Gordon Bennett, alleging that he had performed his obligations under a loan brokerage agreement by producing a lender willing to provide a $7 million construction loan for Crescent's shopping center project in Saskatoon, Saskatchewan, and that Crescent had unlawfully refused to pay the agreed-upon 4 per cent commission. A second count of the complaint alleged a conspiracy by Crescent, the Bennetts, and two additional defendants, The Royal Trust Company ("Royal"), a Toronto bank, and Wachovia Bank and Trust Company ("Wachovia"), located in Winston-Salem, North Carolina, to deprive plaintiff of his commission. A third count alleged tortious interference by Royal and Wachovia with plaintiff's contract rights under the brokerage agreement. The fourth count alleged a claim "in the nature of an action in interpleader" against Crescent and The Bank of Montreal, which held $50,000 in escrow pursuant to an agreement between Crescent and Albert Gareh, Meltzer's co-broker in the loan transaction.

Judge Metzner dismissed the claims asserted against Royal and Wachovia for lack of personal jurisdiction. Judge Murphy dismissed the "interpleader" claim on the ground that Meltzer, as a claimant to rather than a holder of the escrow fund, was not a proper party to bring the interpleader action. Judge Murphy also dismissed the second and fourth claims against Crescent and the Bennetts. Judge Mansfield granted summary judgment in favor of Crescent and the Bennetts on the remaining first claim. Applying New York law, the district judge held that Meltzer's suit was barred by New York Real Property Law, McKinney's Consol.Laws, c. 50, §§ 440, 440–a, 442–d, which as construed by the New York courts, preclude a loan broker from suing for commission on a loan to be secured by a mortgage on real estate where, as conceded here, the unlicensed co-broker participated in the loan transaction. Meltzer appeals from all three orders.

The facts are fully set forth in Judge Mansfield's thorough decision, reported at 315 F.Supp. 142 (S.D.N.Y.1970); accordingly, a brief summary will suffice. Meltzer communicated with the Bennett brothers at the Barclay Hotel during one of their periodic visits to New York City. He stated he had learned that Crescent required a $7 million participation in a loan syndicate organized by Royal to finance the construction of the Midtown Plaza, a combined shopping center and office building complex in Saskatoon. Meltzer introduced the Bennetts to Gareh, the president of Pan American Credit Corporation, at the company's headquarters in Manhattan. Gareh was a specialist in locating American money deposited in European institutions (so-called "Eurodollars") and which was also available for loans. Gareh explained that he could locate a European bank which would deposit $7 million in an American or Canadian banking institution in return for an interest-bearing certificate of deposit or letter of credit, and that the institution in turn would lend that amount to Crescent at a slightly higher rate of interest. Although Gareh eventually found a willing European depositor, UFITEC S.A. of Zurich, he apparently could not persuade any of the five banks he contacted in Canada and the United States to undertake the second part of the proposed two-phase transaction. Crescent eventually borrowed the $7 million from Wachovia after extensive direct negotiations.

Applying the forum state's choice of law principles, as he was required to do in this diversity suit, Klaxon v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), Judge Mansfield determined that the "center of gravity" of the brokerage transactions lay in New York. Auten v. Auten, 308 N.Y. 155, 124 N.E.2d 99 (1954). Appellant has not directed us to any disputed issues of fact relevant to this question. We find the district court's reasons for applying the substantive law of New York convincing. See 315 F.Supp. at 146–147. Appellant does, however, urge that a "genuine issue as to [a] material fact," F.R.Civ.P. 56(c), existed on the issue whether the $7 million loan was to be secured by a mortgage; this fact was of course crucial to the applicability of the cited provisions of the Real Property Law. Meltzer's contention is that the first paragraph of the original brokerage agreement between him and Crescent, which authorized the loan if the Bennetts' "personal and corporate credit" were satisfactory to the lender, implies the contrary. The language quoted, which is certainly subject to a variety of readings, was the only indication in the extensive depositions, affidavits and documentary exhibits before the district court that a mortgage might not be given. Indeed, a later, more detailed paragraph of the same agreement defined Crescent's duty to furnish documentation concerning "the vesting of title" and the "recordation of [the] loan." The draft trust agreement for the syndicate led by Royal was disclosed to Meltzer and Gareh at the inception of their dealings with Crescent, and included a clear requirement that the construction loan be secured by a mortgage. Also, Gareh testified repeatedly that his contacts with American and Canadian banks were always undertaken with a view towards their participation in a mortgage transaction. Moreover, the Royal officer with whom Meltzer and Gareh corresponded consistently made it known that he was "Manager, Mortgage Development," and both Meltzer and Gareh requested that he encourage Crescent to provide promptly the documentation required for the $7 million loan, including such documents as the "mortgage," "title insurance policy," and "the ground leases." Finally, Meltzer himself, in writing to Crescent at a time when Gareh's lack of success in arranging the second step of the proposed transaction was all too apparent, described his cobroker as "working on arrangements to close the mortgage loan." Meltzer did not question the genuineness of any of the documentary evidence indicating that a mortgage was to be given as security. Taken as a whole, the evidence so conclusively negated the mere inference Meltzer relied upon as flowing from the first paragraph of the original agreement that, even viewing the plaintiff's factual allegations with considerable generosity, we must conclude that the question of a mortgage security had ceased to be a genuine issue as to a material fact. Summary judgment was therefore appropriate. Dressler v. M. V. Sandpiper, 331 F.2d 130 (2d Cir. 1964).

Having sustained the district court's conclusion that New York law barred the suit against Crescent and the Bennett brothers, we also affirm the dismissal as to Wachovia and Royal. The law of New York grants no cause of action for inducement of breach when an action on the underlying brokerage contract is barred by reason of the participation of an unlicensed co-broker. See Paramount Pad Co. v. Baumrind, 4 N.Y.2d 393, 175 N.Y.S.2d 809, 151 N.E.2d 609 (1958); Simon v. Noma Electric Corp., 293 N.Y. 171, 56 N.E.2d 537 (1944); Blauner v. Katz, 30 A.D.2d 957, 294 N.Y.S.2d 472 (1968); Muldoon v. Silvestre, 283 App.Div. 886, 129 N.Y.S.2d 420 (1954).